UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PETER DIRKSEN, AVIVA COPAKEN, and STEVEN BELTRAN, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>FUNKO, LLC,<br><br>      Defendant. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Peter Dirksen, Aviva Copaken, and Steven Beltran ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant Funko, LLC ("Defendant" or "Funko"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.     In recent years, federal courts across the country have warned that opaque digital-tracking practices pose a profound threat to Americans' privacy. The unauthorized collection of a person's browsing activity, website interactions, and personal identifiers constitutes an invasion

CLASS ACTION COMPLAINT - 1

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

of the most basic expectation of privacy in one's online life. When a company affirmatively represents that users may control whether their data is sold, shared, or tracked, but then secretly sells, shares, and tracks that data anyway, the misconduct is especially egregious.

2.      Funko is a leading pop culture lifestyle brand, famous for its Pop! Vinyl figures featuring distinctive large heads and small bodies. Founded in 1998, the company holds over 150 licenses—including Marvel, Disney, and Star Wars—to create officially licensed collectibles, apparel, and accessories, allowing fans to showcase their fandom.[1] In 2025, the company recorded roughly $908 Million in net sales.[2]

3.      Funko operates a commercial website, https://funko.com/ (the "Website"), through which users browse and purchase collectible figures, apparel, accessories, and related merchandise; explore exclusive and limited-edition product releases; create and manage user accounts; access order history and customer support services; and engage with promotions, loyalty programs, and special offers.

4.      Like many modern websites, the Website displays a cookie banner (the "Cookie Banner") and a "cookie preferences" interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties.

---

[1]    *About Us*, FUNKO, https://funko.com/funko-about-us/funko-about-us-landing.html#:~:text=Find%20your%20fandom%20at%20Funko%2C%20a%20hub%20for%20pop%20culture,things%20you%20love%20the%20most (last visited May 7, 2026).

[2] *Press Release, Funko Reports 2025 Fourth-Quarter, Full-Year Financial Results; Provides Full-Year Outlook for 2026*, FUNKO – INVESTOR RELATIONS (Mar. 12, 2026) https://investor.funko.com/news-and-events/press-releases/Press-Releases/2026/Funko-Reports-2025-Fourth-Quarter-Full-Year-Financial-Results-Provides-Full-Year-Outlook-for-2026/default.aspx#:~:text=Net%20sales%20were%20$908.2%20million,million%20compared%20with%20$94.7%20million (last visited May 7, 2026).

CLASS ACTION COMPLAINT - 2

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Figure 1 – Cookie Banner and Cookie Settings of Funko, representing that users could change tracking behavior through Cookie Settings*

CLASS ACTION COMPLAINT - 3

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

5. Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the "Tracking Tools") capable of intercepting and transmitting users' data, including communications, the moment users visit the Website, before they can interact with the Cookie Banner.

6. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data may include webpages and products viewed or purchased; inferred interests, preferences, age, location, or other characteristics based on user behavior and content engagement; and personal, device, and technical identifiers such as device type, operating system, and browser type. The data also includes persistent identifiers that enable recognition of users across sessions and websites, users' email addresses, and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to as "Sensitive Information." This Sensitive Information is collected the moment a user arrives on the Website.

7. The Website ostensibly offers users the ability to reject all tracking technologies by clicking the "Reject All" button in the Cookie Banner; and to turn off the sale or sharing of their personal information via cookies by toggling off the individual slider for "Targeting Cookies" and clicking "Confirm My Choices." Such options indicates to users that they could prevent the sale or sharing of their Sensitive Information.

8. However, even after taking such actions, the Website continues to utilize and deploy Tracking Tools which transmit users' data to the advertising, social media, and analytics companies that designed and operate the Tracking Tools (the "Tracking Entities").

9. Funko's Cookie Banner and Cookie Settings deceive users by indicating that users are able to reject all tracking and to disable the sale or disclosure of personal data through cookies while the Website (1) places Tracking Tools on users' browsers, which allows the Tracking Entities to intercept users' communications with the Website before users have the ability to

CLASS ACTION COMPLAINT - 4

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

interact with the Cookie Banner, and (2) continues to use Tracking Tools that intercept and transmit Sensitive Information to Tracking Entities after users reject all tracking or declined and the sale or sharing of their Sensitive Information through cookies. Funko's Website design and procurement of Tracking Entities and Tracking Tools to monitor, intercept, and transmit user data constitute invasion of privacy, intrusion upon seclusion, and fraud. Misrepresenting the effectiveness of a cookie opt-out mechanism and a user's ability to opt out of the sale/sharing of their personal information effectively deprives users of control over their personal information.

10. In short, the Website's Cookie Banner and Cookie Settings materially mislead users about the use and sale of their data. Defendant lulls users into a false sense of security, privacy, and control while simultaneously enabling third parties to monitor, intercept, and transmit users' online behavior in real time. Such conduct deprives users of control over their Sensitive Information and violates fundamental privacy protections.

11. Plaintiffs fell victim to Defendant's deception. Plaintiffs visited Defendant's Website in or around 2025 and 2026 for ordinary consumer purposes, including browsing and comparing products, ordering products, and otherwise navigating the Website's content.

12. While accessing the Website from their respective home states, Plaintiffs encountered the Cookie Banner and related Cookie Settings. Relying on Defendant's representations that marketing and tracking technologies would be disabled upon Plaintiffs' selections in the Cookie Banner, Plaintiffs affirmatively rejected consent to all Tracking Tools. Despite these actions and expectations, Defendant deployed Tracking Tools that automatically intercepted, recorded, and transmitted Plaintiffs' Sensitive Information to the Tracking Entities.

13. Accordingly, Plaintiffs were subjected to the unauthorized disclosure of their Sensitive Information and deprived of the benefit of their privacy choices.

14. Defendant's conduct amounts to a violation of the federal Wiretap Act, 18 U.S.C. §§ 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Penal Code § 631 (illegal wiretapping) and § 638.51 (unlawful use of a pen register or trap and trace device);

CLASS ACTION COMPLAINT - 5

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq., California's Consumer Legal Remedies Act ("CLRA"), CLRA §§ 1750, et seq.; the California Constitution at Cal. Const., Art. I, § 1; and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment.

15.     Plaintiffs bring this action on behalf of themselves and a putative class of similarly situated users harmed by Defendant's deceptive and unlawful practices.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A).

17.     This Court has personal jurisdiction over Defendant because Defendant is registered to do business in this District and maintains its principal place of business in this District.

18.     Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District. Lastly, the venue is proper in this District because Defendant is subject to this Court's personal jurisdiction with respect to this action.

## PARTIES

19.     Plaintiff Peter Dirksen is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Dirksen accessed and used Defendant's Website while physically located in California. Most recently, Plaintiff Dirksen visited the Website in or about

CLASS ACTION COMPLAINT - 6

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

March 2026. Plaintiff Dirksen consistently declines non-essential cookies on all websites he visits as a matter of personal privacy practice. In connection with his visit to Defendant's Website, Plaintiff Dirksen engaged with Defendant's Cookie Banner and rejected all tracking, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Dirksen has never created an account or purchased anything from the Website. Plaintiff Dirksen reasonably believed that by rejecting all tracking, his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Dirksen's affirmative rejection of all tracking, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Dirksen's browsing activity, device identifiers, and related metadata to the Tracking Entities. The interception disclosed the substance of Plaintiff Dirksen's communications with the Website, including the pages and the Funko products he viewed, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Dirksen's clear refusal of tracking technologies. As a result, Plaintiff Dirksen's Sensitive Information was intercepted and disclosed without his consent. Had Plaintiff Dirksen known that Defendant's representations in the Cookie Banner were false, he would not have relied on Defendant's misrepresentations and would not have continued to use the Website.

20. Plaintiff Aviva Copaken is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Copaken accessed and used Defendant's Website while physically located in California. Most recently, Plaintiff Copaken visited the Website in or about April 2025. Plaintiff Copaken consistently rejects non-necessary cookies on all websites she visits as a matter of personal privacy practice. In connection with her visit to Defendant's Website, Plaintiff Copaken engaged with Defendant's Cookie Banner and rejected all tracking, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Copaken has never created an account or purchased anything from the Website. Plaintiff Copaken reasonably believed that by rejecting all tracking, her browsing

CLASS ACTION COMPLAINT - 7

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL 206.682.5600 • FAX 206.682.2992

activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Copaken's affirmative rejection of all tracking, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Copaken's browsing activity, device identifiers, and related metadata to the Tracking Entities. The interception disclosed the substance of Plaintiff Copaken's communications with the Website, including the pages and Funko products she viewed, together with identifiers and related metadata. These Tracking Tools operated notwithstanding Plaintiff Copaken's clear refusal of tracking technologies. As a result, Plaintiff Copaken's Sensitive Information was intercepted and recorded without her consent. Had Plaintiff Copaken known that Defendant's representations in the Cookie Banner were false, she would not have relied on Defendant's misrepresentations and would not have continued to use the Website.

21.     Plaintiff Steven Beltran is, and at all relevant times has been, a citizen and resident of the State of California. Plaintiff Beltran accessed and used Defendant's Website while physically located in California. Most recently, Plaintiff Beltran visited the Website in or about March 2026. Plaintiff Beltran consistently declines non-essential cookies on all websites he visits as a matter of personal privacy practice. In connection with his visit to Defendant's Website, Plaintiff Beltran engaged with Defendant's Cookie Banner and rejected all tracking, relying on Defendant's representations that such selection would disable marketing and tracking technologies. Plaintiff Beltran maintains an account and has purchased Funko products from the Website in the past. Plaintiff Beltran reasonably believed that by rejecting all tracking, his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff Beltran's affirmative rejection of all tracking technologies, Defendant deployed third-party Tracking Tools that intercepted, recorded, and transmitted Plaintiff Beltran's browsing activity, device identifiers, and related metadata to the Tracking Entities. The interception disclosed the substance of Plaintiff Beltran's communications with the Website, including the pages and products he viewed and/or purchased, together with identifiers

CLASS ACTION COMPLAINT - 8

and related metadata. These Tracking Tools operated notwithstanding Plaintiff Beltran's clear refusal of all tracking technologies. As a result, Plaintiff Beltran's Sensitive Information was intercepted and recorded without his consent. Had Plaintiff Beltran known that Defendant's representations in the Cookie Banner were false, he would not have relied on Defendant's misrepresentations, would not have continued to use the Website, and would not have made any purchases on the Website.

22.    Defendant Funko, LLC is a for-profit corporation, incorporated under the laws of the State of Washington, with its principal place of business in Everett, Washington. Funko designs, manufactures, and sells pop culture consumer products, including vinyl figures, collectibles, apparel, and accessories, through its Website, https://funko.com/.

## FACTUAL ALLEGATIONS

### I.    How Websites Function

23.    Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

24.    Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[3]

25.    Each webpage has a unique address, and two webpages cannot be stored at the same address.[4]

26.    When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that user's browser contacts the DNS (Domain Name

---

[3]    *Browsing the Web*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn_web_development/Getting_started/Environment_setup/Browsing_the_web (last visited May 7, 2026).
[4] *Id.*

CLASS ACTION COMPLAINT - 9

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[5]

27.    An IP address is "a unique address that identifies a device on the Internet or a local network."[6] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[7]

28.    When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues an HTTP response that includes the request status and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage by the user's browser upon arrival.[8]

29.    This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure. [9]

30.    The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters.

---

[5]    *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited May 7, 2026).
[6]    *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited May 7, 2026).
[7]    *Id.*
[8]    *Id.*
[9]    *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited May 7, 2026).

CLASS ACTION COMPLAINT - 10

Parameters direct a web server to provide additional context-sensitive services,[10] as depicted below:



*Figure 2 - Mozilla's diagram of a URL, including parameters*

31. Website owners or web developers write and manage the URLs for their websites.

32. URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[11] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

33. The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[12] Today, UTF-8 is the Internet's most common character encoding.[13]

34. URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[14] To demonstrate:

---

[10] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).

[11] *Id.*

[12] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited May 7, 2026).

[13] *UTF-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited May 7, 2026).

[14] *What Is URL Decoding and URL Encoding?*, GOCHYU (last modified May 5, 2026), https://gochyu.com/blog/url-encode-decode (last visited May 7, 2026).

CLASS ACTION COMPLAINT - 11

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992



*Figure 3 – Demonstrating URL encoding and decoding[15]*

35.    Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.

*Figure 4 – Sample webpage used to demonstrate a webpage URL*

---

[15]  Viraj  Shetty,  *URL  Encoding  in  a  few  minutes*,  YOUTUBE  (Sept.  5,  2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited May 7, 2026).

CLASS ACTION COMPLAINT - 12

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992



*Figure 5 – Request URL of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 6)*

*Figure 6 – Decoded, parsed data from Request URL in Figure 5, showing easy-to-read parameters and metadata*

36.    After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the packets sent by the server back into the HTML code of the

CLASS ACTION COMPLAINT - 13

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

webpage, which is then processed by the user's browser, as it arrives,[16] and rendered into a visual display according to the instructions of the HTML code.[17] This is the visible, and usually interactable, website that most people think of.

37. To provide more complex website functionality, website developers will include more complex commands written in other computer programming languages, such as JavaScript snippets, within the HTML documents.[18]

38. Such complex tasks include code used to monitor and report user activity.

39. In short, the Internet relies on a constant back-and-forth stream of requests and responses between a user's browser and a website's stored coding and data. Importantly, the requests and responses provide a perfect snapshot of everything a user does (or does not do) on a website, when and how they do it, and with what software and hardware.

40. Unbeknownst to users, as they browse the Website, the Tracking Tools, including third and first-party cookies, capture and record both incoming and outgoing requests and responses that make up their entire experience on the Website.

**II.    Defendant Programmed the Website to Use Tracking Tools, Including Cookies**

41. When users interact with the Website by navigating pages, clicking links, entering information, or purchasing Funko products, they communicate directly with Defendant.

---

[16] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built into the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See What Is a URL*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn_web_development/Howto/Web_mechanics/What_is_a_URL (last visited May 7, 2026).

[17] *What Is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn_web_development/Howto/Web_mechanics/What_is_a_URL (last visited May 7, 2026).

[18] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited May 7, 2026).

CLASS ACTION COMPLAINT - 14

42. Defendant voluntarily integrated Tracking Tools from various Tracking Entities into its Website's programming. Defendant's inclusion of such tools on its Website is performed pursuant to commercial agreements between Defendant and third parties, including Tracking Entities.

43. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and third parties to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, or even hover over.

44. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

45. Third-party cookies are placed by domains other than the Website's domain, such as google.com, facebook.com, and other advertising or analytics domains. When a user's browser loads a webpage containing embedded third-party resources, the third party's scripts determine whether its cookies already exist on the user's device and, if not, cause those cookies to be stored. These third-party cookies contain unique identifiers that allow third parties to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

46. As detailed further below, Tracking Tools, including first and third-party cookies, that are placed on users' devices are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

CLASS ACTION COMPLAINT - 15

47. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering user preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on user profiles; and (iv) social media integration. Ultimately, Tracking Tools enable Defendant and Tracking Entities to earn more money and enhance marketing effectiveness through the collection, analysis, and dissemination of users' Sensitive Information, especially as users' Sensitive Information is used to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

48. This Sensitive Information has independent, quantifiable value in the marketplace, and that value was directly diminished by Defendant's unauthorized disclosure of such data.[19]

**III. The Website's Cookie Banner Misled Plaintiffs**

49. When Plaintiffs visited the Website, the Website immediately displayed the Cookie Banner. The Cookie Banner read as follows:

50. By clicking "Accept All Cookies", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts. The Cookie Banner further presented users with buttons labeled "Accept All Cookies," "Reject All," and "Cookie Settings" and a close ("x") icon in the top right corner to dismiss the banner.

51. These representations create a reasonable expectation that the tracking system is "opt-in." The Cookie Banner disappears if "Accept All Cookies" or "Reject All" is selected, or if a user clicks the "x" icon to close the banner. Clicking the "Cookie Settings" button opens the Cookie Settings.

---

[19] Helena Vieira, The economic value of personal data for online platforms, firms and consumers, THE LONDON SCHOOL OF ECONOMICS AND POLITICAL SCIENCE (Jan. 19, 2016) https://blogs.lse.ac.uk/businessreview/2016/01/19/the-economic-value-of-personal-data-for-online-platforms-firms-and-consumers/ (last accessed on May 7, 2026)

CLASS ACTION COMPLAINT - 16

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992





*Figure 7 –Funko's Cookie Banner and Cookie Settings, representing that users can manage the use of cookies or the sharing or sale of personal data*

52.    The Website purports to allow users to manage their consent preferences through the Cookie Settings, which indicates that users may control the collection and use of their personal information by toggling options and choosing to allow only strictly necessary cookies.

CLASS ACTION COMPLAINT - 17

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

53.     Defendant explains its use of Tracking Tools on the Website's Cookie Settings by stating, in substance:

> We use cookies and other tracking technologies, and allow our advertising partners to use similar technologies, so we can, among other things, show you ads promoting Funko on other sites and services. We also disclose certain information to our advertising or other partners, such as your email address, so they can show you ads that are more relevant to your interests. These activities may be considered "sales," "sharing," or "targeted advertising" under applicable laws. To opt out of sales, sharing, or targeted advertising that occur via cookies on this site, slide the "Targeting Cookies" toggle below to the left so that it appears in grey, and then click the "Confirm My Choices" button. Alternatively, you can opt out by visiting our website with a legally-recognized opt-out preference signal, such as the Global Privacy Control ("GPC"). Your request to opt out will be linked to your browser, which means you will need to renew your opt-out choice if you visit our website with another device or browser, or if you clear your cookies. To opt-out of non-cookie based "sales," "sharing," or "targeted advertising" associated with your email address or phone number, visit this form (https://funko.com/opt-out-request/opt-out-request-webform.html) and submit the required information. For more information about our privacy practices, please see our Privacy Policy (https://www.funko.com/privacy-policy/privacy-policy.html).[20]

54.     The Cookie Settings state that users can reject non-necessary cookies, including targeting (advertising) cookies, and can opt out of the sale or sharing of personal information on the Website via cookies.

55.     The Cookie Settings further state that "Targeting Cookies" are "Cookies that enable our advertising partners to show you ads promoting Funko on other sites and services." [21] A user can opt out of Targeting Cookies by toggling off the switch. The Cookie Settings also represent that toggling off this switch opts a user "out of sales, sharing, or targeted advertising that occur via cookies on this site."[22]

56.     After users declined all cookies other than those strictly necessary, users were permitted to continue browsing the Website. At that point, the Cookie Settings window disappeared.

---

[20] The Cookie Banner as it appeared on the Website as of April 16, 2026.
[21] *Id.*
[22] *Id.*

CLASS ACTION COMPLAINT - 18

57.      Defendant's representations in its Cookie Banner led users to believe that they could reject all tracking and would only be tracked with their consent, and the representations in its Cookie Settings led users to believe that their data would not be shared or sold via cookies when they affirmatively rejected non-necessary cookies. Defendant's Cookie Banner and Cookie Settings further led Plaintiffs and all reasonable users to believe that Defendant would not allow third parties, to access users' Sensitive Information. Plaintiffs relied and acted upon Defendant's representations by interacting with the Website, including making purchases, after making privacy selections intended to prevent the use of all tracking technologies.

58.      Defendant did not abide by Plaintiffs' or other users' expressed preferences. When Plaintiffs chose to reject all tracking technologies through the Cookie Banner or to decline all non-necessary cookies the Cookie Settings, they clearly communicated that they did not consent to sale or sharing of their information.

## IV.    Defendant's Website Used Tracking Tools

59.      Defendant installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting Plaintiffs' and users' Sensitive Information as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

60.      Generally, the Tracking Tools collect information about users' site activity when events specified by the Defendant, like adding a product to the shopping cart or loading specific webpages, are triggered. Defendant added parameters to events that determine just how much data is collected, and how specific that data is.

61.      Parameters are strings of text that website owners add to a URL to track and organize their webpages.[23] URL parameters include key-value pairs formatted as "key=value."

---

[23] Yongi Barnard, *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (last updated Feb. 5, 2026), https://backlinko.com/url-parameters (last visited May 7, 2026).

CLASS ACTION COMPLAINT - 19

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

a.   The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

b.   The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)



*Figure 8 - Diagram of a URL displaying how parameters function*[24]

### A.  Google Tracking Tools

#### i.   Google Ads

62.   Google Ads, formerly AdWords, is an advertising platform developed by Google that allows advertisers to bid to display advertisements, service offerings, product listings, or videos to web users.[25]

63.   The process for advertisers using Google Ads to display ads within Google search results is as follows: (i) advertisers create text-based ads with a title, description, and a link to the website to place within the Google search results; (ii) advertisers then choose keywords, usually related to their business or target audience, intended to trigger their ads to appear within the user's

---

[24] *Id.*

[25]*Achieve all your ad goals in one place*, GOOGLE ADS, https://ads.google.com/home/goals/ (last visited May 7, 2026).

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

CLASS ACTION COMPLAINT - 20

search results;[26] (iii) Google then allows advertisers to bid on those various keywords;[27] (iv) the advertiser with the highest bid wins the auction, and the ad is displayed on the search results page; and (v) the winning ad appears above or below the organic search results and is marked as an ad.

64.    Google AdSense works in conjunction with the Google Ads bidding system and allows website owners, like Defendant, to display Google Ads on their websites and earn a revenue share when ads are viewed or clicked.[28] The search terms bid on through Google Ads are used by website owners participating in Google AdSense, allowing those owners to share in advertising revenue generated by Google.

65.    AdSense for content or AdSense for search are methods by which AdSense functions.[29] In either configuration, AdSense matches advertisements to website users based on the content of the website and user activity.

66.    Google Ads intercepted Plaintiffs' search activity, as depicted below, using a sample search for "blue figure" on the Website. This interception occurred through users' browsers, similar to the Facebook Pixel, as communications were sent and/or received on users' devices.

---

[26] *Reach the right people with Search ads*, GOOGLE ADS, https://ads.google.com/home/campaigns/search-ads/ (last visited May 7, 2026).
[27] *Id.*
[28] *Home*, GOOGLE ADSENSE, https://adsense.google.com/start/ (last visited Jan 6, 2026).
[29] *AdSense revenue share*, GOOGLE ADSENSE HELP, https://support.google.com/adsense/answer/180195?hl=en (last visited Jan 07, 2026).

CLASS ACTION COMPLAINT - 21

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Figure 9 – Test search made on the Website resulted in sharing Content Views with Google Page Ads*

CLASS ACTION COMPLAINT - 23

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

67.     Google benefits when website owners utilize Google Ads and Google AdSense in connection with their websites.

68.     Through Google AdSense, Google aggregates viewing data collected from website users. Google uses that data to improve its services and deliver more relevant search results. By analyzing patterns and trends in user behavior, Google gains insight into what users view and what they are interested in. That insight supports service improvements, product development, and revenue growth.

69.     Google's collection and analysis of page views also allows it to improve its machine learning algorithms.[30] Google uses data on how users interact with websites to train its algorithms to provide more accurate and relevant search results.[31] For example, when a user clicks on a particular link and spends more time on that page, Google treats that interaction as a signal of relevance to that user's interests. By aggregating such data across users, Google can develop advertising profiles that include demographic and interest-based attributes, such as age range, industry, and interests.[32]

70.     Google profits in several ways from the Website's use of the Google AdSense: (i) advertisers bid and pay Google for the keywords that will result in their ads showing in search results; (ii) through AdSense, every time a user clicks or views an ad (depending on their chosen method), the advertiser will pay Google for that click or view; (iii) and Google's ability to aggregate user viewing data allows Google to further tailor its products to advertisers and users by training its algorithms on large volumes of data.

ii.     *Google Analytics*

71.     Like the Meta Pixel, Google Analytics ("GA") collects data about user interactions with a website. That data includes link clicks, button clicks, form submissions, conversions,

---

[30] Elle Poole Sidell, *What Does Google Do With Your Data?*, AVAST (Dec. 18, 2020), https://www.avast.com/c-how-google-uses-your-data (last visited May 7, 2026).
[31] *Id.*
[32] *Id.*

CLASS ACTION COMPLAINT - 24

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

shopping cart abandonment, items added to or removed from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[33]

72.    GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[34] Notably, Google notifies web developers that developers should provide "visitors with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[35]

73.    GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for user disclosure to website developers, including Defendant.

74.    Here, Defendant added GA to the Website. That implementation caused Plaintiffs' webpage views to be intercepted and transmitted to Google, as shown by the example taken directly from the Website below:

---

[33] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited May 7, 2026).
[34]    *About    the    Google    tag*,    GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited May 7, 2026).
[35] *Id.*

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992



*Figure 10 Users' communications with the Website being captured by Google Analytics*

75.     After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendant to monetize the collected data through targeted advertising.

76.     These Tracking Tools continue to intercept users' communications with the Website even when a user chooses to allow only strictly necessary cookies and to stop the sale and sharing of their personal information with third parties.

**B.   The Meta Pixel**

77.     Meta offers its own tracking pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Meta.

78.     The Meta Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook

CLASS ACTION COMPLAINT - 26

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

account with its Pixel and then add code to the website to make use of the Pixel.[36]

79.     Upon creating a Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[37] This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Pixel directly into a website.[38]

80.     This Pixel ID must match "a known Pixel ID" in Meta's system,[39] and is transmitted by the Meta Pixel.[40]

81.     As Meta notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[41]

82.     The Meta Pixel is employed by Defendant to gather, intercept, and then share user information with Meta.[42] Receiving this information enables Meta and Defendant to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[43]

---

[36] *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited May 7, 2026).
[37] *Id.*
[38] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited May 7, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").
[39] *Meta Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited May 7, 2026)
[40] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited May 7, 2026).
[41] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited May 7, 2026) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").
[42] The Facebook Pixel allows websites to track user activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited May 7, 2026).
[43] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited May 7, 2026).

CLASS ACTION COMPLAINT - 27

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

83. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and view content.[44]

84. Once implemented on a website, the Meta Pixel begins to share users' information the moment a user lands on the website.

85. When a Facebook account holder logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[45] These cookies allow Meta to link the data it receives through the Meta Pixel to individual Facebook account holders.

86. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.

*Figure 11– Sample c_visitor cookie, containing FID of test account created by Plaintiffs' counsel to investigate the Facebook Pixel*

87. A simple search for "what is a c_user cookie" leads one to learn that the string of numbers is the FID of the user, demonstrating that even non-technical internet users can, without specialized knowledge, discover and apply a FID to locate a given Facebook profile.

---

[44] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited May 7, 2026).
[45] *Cookies Policy: What are cookies, and what does this* policy cover?, FACEBOOK (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited May 7, 2026).

CLASS ACTION COMPLAINT - 28

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992



*Figure 12 – Google AI answer to search for "what is the c_user cookie"*

88.     A subsequent Google search for "facebook user id" reveals that the URL of a Facebook profile is facebook.com followed by the FID.

CLASS ACTION COMPLAINT - 29

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Figure 13 – Google AI answer to search for "facebook user id"*

89.     Even simpler, with the rise in General Artificial Intelligence agents such as ChatGPT, anyone with an internet connection can use tools to decipher computer code, as demonstrated below.

CLASS ACTION COMPLAINT - 30

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Cookie    datr=SRe2ZwkqD1MICziMOaVSbrBb; sb=axe2Z3ELf4psOiSR5g4mAbnw; ps_n=1; c_user=■■■■■■■■ fr=1pt1CrZUb5GCIKrsE.AWf9w0OWi6U7vLypxV2ASHrQbvGC1HbHs4N2zS9Z_yAtcwFYg hs.BoONEO..AAA.0.0.BoONEO.AWePM8vKPdJ0voFcIFNQPsmTNsU; xs=16%3A2Jkg3ou-pgMbfQ%3A2%3A1739986850%3A-1%3A-1%3A%3AAcU9K7MEQI5AH9t7NzLyUbCqy-P5BBoaBeHEfV2AVYo; ar_debug=1

*Figure 14 – Screenshot from a browser's developer tools of cookies transmitted from a Pixel transmission (c user redacted)*



Identify the person who watched the video

The cookie header you've provided includes this key-value pair:

ini                                                    Copy    Edit

c_user=■■■■■■

This is a **Facebook user ID** that corresponds to the person who was **logged into Facebook** in the browser session when the video was accessed.

## Can this ID identify the person?

- **Yes, but only within Facebook's system.**
  The `c_user` value (■■■■■■■) is a unique Facebook user ID tied to an account. If **you control this browser session** (e.g., it's your own), you could:

  - Paste this URL into your browser:
    `https://www.facebook.com/`■■■■■■■

- It will redirect to the associated profile (if it exists and hasn't been deleted or made private).

*Figure 15 – Screenshot from ChatGPT response to query "Identify the person who watched the video" with screenshot of cookies from Figure 9 (c_user redacted)*

90.    The FID can simply be appended to www.facebook.com/ to navigate to the visitor's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 11*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the FID, as depicted below:

CLASS ACTION COMPLAINT - 31

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

*Figure 16 – Sample Facebook account created by Plaintiffs' counsel to investigate the Facebook Pixel, with FID highlighted in URL*

91.    The Meta Pixel tracks user-activity on web pages by monitoring events,[46] which, when triggered, causes the Meta Pixel to automatically send data – here, users' Sensitive Information – directly to Meta.[47] Examples of events utilized by websites include when a user

---

[46]    *About    Meta    Pixel*,    FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142    (last visited May 7, 2026).

[47] *See generally id.*

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

CLASS ACTION COMPLAINT - 32

loads a page with a Pixel installed (the "PageView event");[48] The Website utilizes this PageView event.[49]

92.    Defendant's use of the Meta Pixel also transmits its unique Pixel IDs via the "id" parameter, which contains Defendant's Pixel ID of "1237351360859616".

93.    Defendant and Meta's use the Meta Pixel to monetize Website users' Sensitive Information.

94.    Meta independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Through the use of users' Sensitive Information, Meta refines its marketing algorithms, profiting from the ability to more accurately target potential customers. Defendant then makes use of Meta's refined marketing profiles to target users with advertising.

95.    Defendant's concealed use of the Meta Pixel on the Website is demonstrated by the screenshot below, which shows a user viewing the sample product on the Website from *Figure 4.*

---

[48]    *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142    (last visited May 7, 2026).

[49] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142    (last visited May 7, 2026).

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Figure 17 – Meta Pixel tracking a user landing on the webpage from Figure 4 through the "PageView" event*

96.    When a business applies with Meta to use the Meta Pixel, it is provided details about its functionality, including with respect to private information.[50]

97.    To make use of the Meta Pixel, Defendant agreed to Meta's Business Tool Terms (the "Meta Terms").

98.    The Meta Terms inform website owners using Meta's Pixel that the employment of the Meta Pixel will result in data sharing, including with Meta, through the automatic sharing of Pixel Event information and contact information.[51]

---

[50] *See Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 7, 2026). (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook Visitor accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[51] *Meta Business Tools Terms*, FACEBOOK (Nov. 3, 2025), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited May 7, 2026).

CLASS ACTION COMPLAINT - 34

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

99.     The Meta Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against visitor IDs, as well as to combine those visitor IDs with corresponding [Pixel Event information]."[52]

100.    Meta directs parties implementing the Meta Pixel, such as Defendant, to encrypt request information[53] before data can be shared.[54]

101.    Meta further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Meta.

102.    Meta educates or reminds Meta Pixel users, such as Defendant, of their responsibility to inform their users of their website's data sharing practices and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any Tracking Entities.[55]

103.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Meta's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' Sensitive Information.

### C. Salesforce (Einstein API)

104.    Salesforce is an agentic enterprise company that helps business grow by integrating all aspects of their business in a single platform. One of the software tools offered by

---

[52] *Id.*

[53] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method, which makes users' information visible. *See id.*

[54] *Id.*

[55] *Best practices for privacy and data use for Meta Business Tools*, FACEBOOK, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited May 7, 2026).

CLASS ACTION COMPLAINT - 35

Salesforce is the Einstein API ("Einstein"), which is used to track shopper activity.[56] Einstein collects data from users on the Website, allowing Salesforce and the Website to create a profile for each individual user and create personalized product recommendations for them.[57]

105.    The Einstein API tracks and intercepts events on the Website, sending events such as viewed products back to Salesforce.[58] These events track the actions users take on the Website.

106.    The Einstein API identifies users, and builds individual profiles for them, by associating them with unique ids. Users who visit a website are assigned a unique uuid cookie that associates them and their website communications with a personalized profile.[59] Users who are logged into a website are also assigned a unique cookieId and userId, which are set as first-party cookies.[60]

107.    Defendant has implemented Einstein on the Website and uses it to build personalized profiles for Website users. The use of Einstein on the Website can be seen in the figures below:

---

[56] *Einstein Activities* SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/references/einstein-activities?meta=Summary (last accessed on May 7, 2026).
[57] *Einstein Profile Connector* SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/references/einstein-profile-connector?meta=Summary (last accessed on May 7, 2026).
[58] *Einstein Activity Usage* SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/guide/usage.html (last accessed on May 7, 2026).
[59] *UuidParam* SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/references/einstein-profile-connector?meta=type%3AUuidParam (last accessed on May 7, 2026).
[60] *Send Profile Data* SALESFORCE, https://developer.salesforce.com/docs/commerce/einstein-api/guide/send-profile-data.html (last accessed on May 7, 2026).

CLASS ACTION COMPLAINT - 36

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Figure 18 –Einstein on the Website*

108. The figures show Einstein tracking users on the Website and building profiles for them using the uuid cookie. This third-party cookie and Einstein, continued to be placed and intercept users' communications with the Website even after users chose to decline all non-necessary cookies. These cookies are not necessary, but are instead used for marketing purposes.

## V.    Defendant Violated CIPA and the Federal Wiretap Act

109. Cal. Penal Code § 631(a) prohibits several distinct and independent forms of unlawful interception, including: (1) intentionally tapping or making an unauthorized connection with a communication; (2) willfully attempting to read or learn the contents or meaning of a

CLASS ACTION COMPLAINT - 37

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

communication while it is in transit; and (3) using or communicating information obtained through such interception. Section 631(a)(iv) separately imposes liability on any party who aids, agrees with, employs, or conspires with another to commit any of those acts.

### A. Tracking Entities Intercepted the Contents of Plaintiffs' Communications in Transit

110.    Transmitted URLs that include both the path and query string reflect the substance of a user's communication and therefore constitute content.

111.    Here, the network requests intercepted by the Tracking Entities included detailed Request URLs containing the names and file locations of webpages, the products users browsed on the Website, identifying information in the form of cookies, and user activity information indicating users' commercial activity and purchases.

112.    The Tracking Tools intercepted the contents of Plaintiffs' communications contemporaneously with Plaintiffs' interactions with the Website. The Tracking Tools began transmitting data to the Tracking Entities as soon as the Tracking Tools loaded onto Plaintiffs' browsers, and additionally transmit data at the moment Plaintiffs submitted information through the Website.

113.    This interception, duplication, and transmission occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or otherwise before the communications were transmitted from users' devices, and therefore occurred while the communications were in transit.

114.    The Tracking Entities were third parties to Plaintiffs' communications with Defendant's Website, and intercepted, read, duplicated, and retransmitted users' data while it was in transit.

115.    Defendant's deployment of the Tracking Tools enabled Tracking Entities to intercept Request URLs that specified the content Plaintiffs accessed on the Website, in violation of Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

CLASS ACTION COMPLAINT - 38

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**B.  Defendant Aided and Abetted Third-Party Interceptions**

116.    A party violates Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a) not only by directly intercepting communications, but also by knowingly permitting or facilitating third-party interception.

117.    Defendant knowingly procured the Tracking Entities to embed and configure the Tracking Tools in its Website, in a manner that enabled the Tracking Entities to intercept the contents of Plaintiffs' communications with the Website.

118.    CIPA at Cal. Penal Code § 631(a) requires the prior consent of all parties to the communication.

119.    18 U.S.C. § 2511(2)(d) requires the prior consent of at least one party to the communication.

120.    Defendant did not obtain Plaintiffs' express or implied consent to allow the Tracking Entities to intercept their communications and Sensitive Information, before or after the interceptions occurred, nor could Defendant consent to the interception of those communications, as the scope of its consent was bound to the Terms provided by the Tracking Entities, which required obtaining valid consent from Plaintiffs and/or otherwise prohibited the use of the Tracking Tools for intercepting sensitive or legally protected data. Defendant established the data was sensitive by allowing users to choose to disallow its sharing, despite its ultimate disregard for that choice.

**C.  The Tracking Tools are Trap and Trace and/or Pen Register Devices.**

121.    California law defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

CLASS ACTION COMPLAINT - 39

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

122. California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

123. The Tracking Tools are processes to identify the source of electronic communication by capturing incoming electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their phone number and other identifying information. As such, the Tracking Tools are "trap and trace" devices.

124. The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, they are designed specifically for that purpose. The IP addresses, detailed URLs, cookies, and Pixel IDs disclosed through the use of the Tracking Tools identify: (i) the source and destination of incoming signals to Plaintiffs' devices to the Tracking Entities; and (ii) the source and destination of outgoing signals from Plaintiffs' devices.

125. Defendant is "a provider of electronic or wire communication service" as they provide the Website, where users send electronic communications. Cal. Penal Code § 638.51(b).

126. Defendant did not obtain Plaintiffs' express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of digital fingerprinting and de-anonymization.

127. The CIPA at California Pen. Code § 637.2 imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. No court order to install a trap and trace device via the Tracking Tools was obtained by Defendant.

128. Defendant did not obtain Plaintiffs' or the Class Members' express or implied consent to be subjected to data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

CLASS ACTION COMPLAINT - 40

***D. Defendant Promised Users that Tracking Could Be Disabled, but Continued Tracking Anyway***

129.    When users visit Defendant's Website, they are presented with a Cookie Banner and Cookie Settings that stated they could control whether their information is tracked and shared with third parties.



*Figure 19 – The Cookie Banner shown to users who visit the Website*

130.    However, Plaintiffs' investigation revealed that the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users clicked "Accept All Cookies" on the Cookie Banner. Indeed, even after users rejected non-essential Tracking Tools and selected only strictly necessary cookies, Defendant continued deploying Tracking Tools by, at a minimum, Facebook, Google, and Salesforce.

CLASS ACTION COMPLAINT - 41

```
✕   Headers   Payload   Preview   Response   Initiator   Timing   Cookies
▼ General
  Request URL        https://www.google.com/ccm/collect?en=page_view&dl=https%3A%2F%2Ffunko.com%2Fpop-rides-deluxe-vivi-karoo%2F75584.html&scrsrc=www.googletagmanager.com&frm=0&rnd=85
                     3566376.1749145463&dt=Pop!%20Rides%20Deluxe%20Vivi%20%26%20Karoo%20%7C%20Funko&auid=1912609453.1749141909&navt=r&npa=0&gtm=45He5641h2v866773825za200&g
                     d=13l3l3l3l1l1&dma=0&tag_exp=101509157~102015665~103116026~103200004~103233427~103351869~103351871~104611962~104611964~104661466~104661468&tft=1749145462
                     823&tfd=2870&apve=1&apvf=f
  Request Method     POST
  Status Code        ● 200 OK
  Remote Address     142.250.191.36:443
  Referrer Policy    strict-origin-when-cross-origin
▶ Response Headers (16)
▼ Request Headers
  :authority         www.google.com
  :method            POST
  :path              /ccm/collect?en=page_view&dl=https%3A%2F%2Ffunko.com%2Fpop-rides-deluxe-vivi-
                     karoo%2F75584.html&scrsrc=www.googletagmanager.com&frm=0&rnd=853566376.1749145463&dt=Pop!%20Rides%20Deluxe%20Vivi%20%26%20Karoo%20%7C%20Funko&auid=191
                     2609453.1749141909&navt=r&npa=0&gtm=45He5641h2v866773825za200&gcd=13l3l3l3l1l1&dma=0&tag_exp=101509157~102015665~103116026~103200004~103233427~1033518
                     69~103351871~104611962~104611964~104661466~104661468&tft=1749145462823&tfd=2870&apve=1&apvf=f
  :scheme            https
  Accept             */*
  Accept-Encoding    gzip, deflate, br, zstd
  Accept-Language    en-US,en;q=0.9
  Content-Length     0
  Cookie             __Secure-3PSID=g.a000xgjIdhAplMIumGnMROkqZJDjT0CcVoirr8gWkteyaSuOS9dAHcDG14dQLgxCIvK4bQE1kAACgYKAVUSARcSFQHGX2MiawsAz-3-
                     qt92k_7x2q6bgRoVAUF8yKq4bR9ehxCmPVY2sGLmRtkt0076; __Secure-3PAPISID=n5rKskiCIK0mU-JY/A6z_wdVz4mdBqd-5D; __Secure-3PSIDTS=sidts-
                     CjEB5H03PzVIyUwIoPu3F_snIn8N7Bnf_zKsZzPIsuh6wQbq_VfPYgozgIxLMSq2ihS7EAA; NID=524=FnoUNgS-XrwwerXqOuCm03og2-VqIpaOHmqoR_7r1jG-
                     AjdIfLfsaUNnVfUI_iaqTnc8qq6vwEBj6p9PKAD6IWZZ3wDd9ePoFIkQVgPbDVaAfEVpJjgZmygtzz2MhxvEH90IU-qQta9WztJhTZ-
                     qL4W3MV3sovmm3w6r2DH108KSJxfLDzUKMWycOVEaA1k6ydbXEZlYMIWhFd32ny6R2KbbLA0VkcsrZvzXbR7ps9VCcpYEUgTBSL3nUUSQMK36wz-7J-RRjH-
                     bSInf3_JWjRUmDcxsqxqFWfM_V1c4EqvTCz3SuwP9PrOefa2dZSVuztaEWna0Gq21TtNevr_MH0yQqUjK81_vEZj1przEs7I; __Secure-
                     3PSIDCC=AKEyXzWpzUQHLSpr1ZiC3hbiHQvcWmVg6pl7_tgBfHkOZLSh7Kz0kCOKwbHsl_FLtJTJbx_Keg
  Origin             https://funko.com
  Priority           u=1, i
  Referer            https://funko.com/
  Sec-Ch-Ua          "Google Chrome";v="137", "Chromium";v="137", "Not/A)Brand";v="24"
  Sec-Ch-Ua-Mobile   ?0
  Sec-Ch-Ua-Platform "Windows"
  Sec-Fetch-Dest     empty
```

```
✕   Headers   Payload   Preview   Response   Initiator   Timing   Cookies
▼ General
  Request URL        https://www.google.com/ccm/collect?en=page_view&dl=https%3A%2F%2Ffunko.com%2Fpop-rides-deluxe-vivi-karoo%2F75584.html&scrsrc=www.googletagmanager.com&frm=0&rnd=85
                     3566376.1749145463&dt=Pop!%20Rides%20Deluxe%20Vivi%20%26%20Karoo%20%7C%20Funko&auid=1912609453.1749141909&navt=r&npa=0&gtm=45He5641h2v866773825za200&g
                     d=13l3l3l3l1l1&dma=0&tag_exp=101509157~102015665~103116026~103200004~103233427~103351869~103351871~104611962~104611964~104661466~104661468&tft=1749145462
                     823&tfd=2870&apve=1&apvf=f
  Request Method     POST
  Status Code        ● 200 OK
  Remote Address     142.250.191.36:443
  Referrer Policy    strict-origin-when-cross-origin
▶ Response Headers (16)
▼ Request Headers
  :authority         www.google.com
  :method            POST
  :path              /ccm/collect?en=page_view&dl=https%3A%2F%2Ffunko.com%2Fpop-rides-deluxe-vivi-
                     karoo%2F75584.html&scrsrc=www.googletagmanager.com&frm=0&rnd=853566376.1749145463&dt=Pop!%20Rides%20Deluxe%20Vivi%20%26%20Karoo%20%7C%20Funko&auid=191
                     2609453.1749141909&navt=r&npa=0&gtm=45He5641h2v866773825za200&gcd=13l3l3l3l1l1&dma=0&tag_exp=101509157~102015665~103116026~103200004~103233427~1033518
                     69~103351871~104611962~104611964~104661466~104661468&tft=1749145462823&tfd=2870&apve=1&apvf=f
  :scheme            https
  Accept             */*
  Accept-Encoding    gzip, deflate, br, zstd
  Accept-Language    en-US,en;q=0.9
  Content-Length     0
  Cookie             __Secure-3PSID=g.a000xgjIdhAplMIumGnMROkqZJDjT0CcVoirr8gWkteyaSuOS9dAHcDG14dQLgxCIvK4bQE1kAACgYKAVUSARcSFQHGX2MiawsAz-3-
                     qt92k_7x2q6bgRoVAUF8yKq4bR9ehxCmPVY2sGLmRtkt0076; __Secure-3PAPISID=n5rKskiCIK0mU-JY/A6z_wdVz4mdBqd-5D; __Secure-3PSIDTS=sidts-
                     CjEB5H03PzVIyUwIoPu3F_snIn8N7Bnf_zKsZzPIsuh6wQbq_VfPYgozgIxLMSq2ihS7EAA; NID=524=FnoUNgS-XrwwerXqOuCm03og2-VqIpaOHmqoR_7r1jG-
                     AjdIfLfsaUNnVfUI_iaqTnc8qq6vwEBj6p9PKAD6IWZZ3wDd9ePoFIkQVgPbDVaAfEVpJjgZmygtzz2MhxvEH90IU-qQta9WztJhTZ-
                     qL4W3MV3sovmm3w6r2DH108KSJxfLDzUKMWycOVEaA1k6ydbXEZlYMIWhFd32ny6R2KbbLA0VkcsrZvzXbR7ps9VCcpYEUgTBSL3nUUSQMK36wz-7J-RRjH-
                     bSInf3_JWjRUmDcxsqxqFWfM_V1c4EqvTCz3SuwP9PrOefa2dZSVuztaEWna0Gq21TtNevr_MH0yQqUjK81_vEZj1przEs7I; __Secure-
                     3PSIDCC=AKEyXzWpzUQHLSpr1ZiC3hbiHQvcWmVg6pl7_tgBfHkOZLSh7Kz0kCOKwbHsl_FLtJTJbx_Keg
  Origin             https://funko.com
  Priority           u=1, i
  Referer            https://funko.com/
  Sec-Ch-Ua          "Google Chrome";v="137", "Chromium";v="137", "Not/A)Brand";v="24"
  Sec-Ch-Ua-Mobile   ?0
  Sec-Ch-Ua-Platform "Windows"
  Sec-Fetch-Dest     empty
```

CLASS ACTION COMPLAINT - 42

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992





*Figure 20- Google Pixel tracking a user who declined all unnecessary cookies*

*Figure 21- Google Analytics tracking a user who declined all unnecessary cookies*

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992





*Figure 22- The Meta Pixel tracking a user who declined all unnecessary cookies*

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Figure 23 - Einstein tracking a user who declined all unnecessary cookies*

131.    Defendant intentionally placed Google, Facebook, and Salesforce tracking cookies on the Website and allowed Google, Facebook, and Salesforce to track users and intercept their communications with the Website, despite stating in the Cookie Banner and Cookie Settings that the Tracking Tools would not be deployed and in the Cookie Settings that users' information would not be shared with third parties via cookies.

132.    Defendant and the Tracking Entities benefited from the interception of Plaintiffs' communications by reading and subsequently using the intercepted contents to construct detailed

CLASS ACTION COMPLAINT - 45

profiles reflecting Plaintiffs' browsing habits and interests, and by using those profiles for targeted advertising.[61]

133.    The Tracking Entities independently benefit from the interception of communications, using data collected through the Tracking Tools to improve their advertising products and market those capabilities to other businesses.[62]

**TOLLING**

134.    The statutes of limitations applicable to Plaintiffs' and the Class members' claims are tolled by Defendant's wrongful conduct and by Plaintiffs' and the Class members' delayed discovery of their claims. Defendant's acts were intentionally concealed, technically complex, and inherently self-concealing, thereby preventing Plaintiffs and the Class members from discovering the unlawful disclosure of their Sensitive Information until recently.

135.    Defendant not only facilitated and enabled the covert incorporation of Tracking Entities' Tracking Tools into its Website, but also, via its Cookie Banner and Cookie Settings misrepresented its data sharing practices.

136.    Defendant possessed superior and exclusive knowledge that the Tracking Entities' Tracking Tools embedded within its Website would disclose Plaintiffs' and Class members' Sensitive Information.

137.    Plaintiffs and the Class members could not, through the exercise of reasonable diligence or have discovered the full scope of Defendant's conduct and misrepresentations

---

[61] *See About Advanced Matching for Web*, TikTok, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited May 7, 2026); *Meta Pixel*, Facebook, https://www.facebook.com/business/tools/meta-pixel (last visited May 7, 2026); *Enable automatic enhanced match*, Pinterest, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited May 7, 2026).

[62] *See TikTok Business Products (Data) Terms*, TikTok (Jan. 22, 2026), http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited May 7, 2026).; *Meta Business Tools Terms*, Facebook (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited May 7, 2026).

CLASS ACTION COMPLAINT - 46

Tousley Brain Stephens PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

because the technology involved is highly technical and not reasonably discernible to ordinary users.

138.  Plaintiffs and the Class members first became aware of Defendant's misconduct as a result of counsel's investigation and technical analysis conducted in advance of filing this Complaint.

## **CLASS ALLEGATIONS**

139.  Plaintiffs bring these claims for relief, individually and on behalf of the following Class and Subclasses, pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3):

> All natural persons who visited and interacted with Defendant's Website in the United States during the applicable limitations period and whose electronic communications were intercepted, disclosed, or shared through Defendant's Tracking Tools and Tracking Entities (the "Class").

140.  Plaintiffs bring this class action individually and on behalf of the following California Subclass:

> All members of the Class who visited and interacted with Defendant's Website while located in the State of California during the applicable limitations period (the "California Subclass").

141.  Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

142.  Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class and Subclass should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

CLASS ACTION COMPLAINT - 47

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

143. NUMEROSITY: At this time, Plaintiffs do not know the number of Class members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class members may be ascertained via the records maintained by the Defendant.

144. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class Members, and which may be determined without reference to the individual circumstances of any Class Members, include but are not limited to the following:

      a. Whether Defendant shared the Class Members' Sensitive Information with the Tracking Entities or other third parties;

      b. Whether Defendant obtained effective and informed consent to do so;

      c. Whether the Class Members are entitled to statutory penalties; and

      d. Whether the Class Members are entitled to injunctive relief.

145. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiffs are asserting claims that are typical of the members of the Class.

146. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

147. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely

CLASS ACTION COMPLAINT - 48

continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE WIRETAP ACT
### 18 U.S.C. §§ 2510, et seq.
### (On Behalf of Plaintiffs and the Class)

148.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

149.    Plaintiffs bring this cause of action on behalf of themselves and all Class members.

150.    The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

151.    The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

152.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

153.    The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

154.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

155.    The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

CLASS ACTION COMPLAINT - 49

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

156. Defendant is a "person" within the meaning of the Wiretap Act.

157. The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

158. Plaintiffs had reasonable expectations of privacy in their electronic communications with Defendant's Website, including the pages they viewed, searches conducted via the Website, browsing activity, shopping-related interactions, and other interactions with Website features, particularly where Defendant represented through its Cookie Banner and Cookie Settings that users could opt out of, or needed to opt in to, the sale/sharing of personal information by rejecting the Tracking Tools.

159. An objectively reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on commercial websites, such as searches, browsing, and order interactions, are sensitive and convey the substance and meaning of the communication, i.e., Sensitive Information.

160. A reasonable user is entitled to assume that any disclosure of the contents of their communications occurs lawfully and with consent. To hold otherwise would require users to assume their privacy will be violated as a matter of course.

161. Plaintiffs reasonably expected that the Tracking Entities were not intercepting, recording, or using the contents of their electronic communications with Defendant's Website without their consent.

162. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were sent by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent, for the unlawful purpose of monetizing the Plaintiffs' intercepted information, including for combining that information with information collected about Plaintiffs from across the internet and used for advertising, analytics, and marketing optimization.

CLASS ACTION COMPLAINT - 50

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

163. Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, used search or location features, viewed electronics, placed an order, or otherwise communicated information to the Website through their browsers.

164. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website, and understood that doing so would result in the interception and transmission of users' communications to Tracking Entities.

165. Plaintiffs were never asked to consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. To the contrary, via Defendant's Cookie Banner, Plaintiffs affirmatively rejected all Tracking Tools.

166. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. *See* 18 U.S.C. § 2511(1)(a).

167. Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website and allowed Tracking Entities to intercept the communications of users on the Website, in order to subsequently disclose those communications to the Tracking Entities for marketing. Those disclosures were made fraudulently, based on Defendant's false representations in the Cookie Banner and Cookie Settings, and constitute unlawful invasions of privacy.

168. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

     a.    damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or

     b.    statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

     c.    reasonable attorneys' fees and costs.

CLASS ACTION COMPLAINT - 51

## COUNT II
## COMMON LAW INVASION OF PRIVACY
### Intrusion Upon Seclusion
### (On Behalf of Plaintiffs and the Class)

169.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

170.    Plaintiffs bring this cause of action on behalf of themselves and all Class members.

171.    Defendant has intruded upon the legally protected privacy interests of Plaintiffs and the Class members by, among other things, permitting third-party tracking technologies to collect, track, and compile users' Sensitive Information while representing to users that they could opt out of, or needed to opt in to, such collection.

172.    Plaintiffs and the Class members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their Sensitive Information, including browsing activity, personal identifiers, and related metadata. Plaintiffs expected that their interactions with the Website would not be shared with the Tracking Entities.

173.    Plaintiffs and the Class members relied on Defendant's representations and exercised the Website's opt-out controls, reasonably expecting that Defendant would honor its affirmative representation in the Cookie Banner and Cookie Settings that users could opt out of, or needed to opt in to, the use of Tracking Tools and could decline all non-necessary cookies.

174.    Despite Plaintiffs' and the Class members' opt-outs and affirmative rejection of all but strictly necessary cookies, Defendant permitted third parties to use cookies and related Tracking Tools to collect and compile users' Sensitive Information, including the categories described above. The Tracking Entities used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

175.    Defendant lacked any legitimate business justification for permitting the placement and transmission of the third-party cookies and Tracking Tools that allowed Tracking Entities to access, intercept, and collect users' Sensitive Information, contrary to users' privacy choices, including express opt-outs or lack of opt-ins.

176.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class members suffered injury, including but not limited to loss of privacy, loss of control over their Sensitive Information, diminution in value of their private data, and other compensable harms.

## COUNT III
### INVASION OF PRIVACY AND VIOLATION OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1
#### (On Behalf of Plaintiffs and the California Subclass)

177.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

178.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

179.    California voters added the word "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative."

180.    In support of Proposition 11, voters stated that:

181.    The right of privacy is the right to be left alone … It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

CLASS ACTION COMPLAINT - 53

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

182. Plaintiffs and the California Subclass members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications. Plaintiffs' and California Subclass members' protected interests arise from various statutes and common law, including, *inter alia*, the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of our personal information."

183. The privacy rights of Plaintiffs, and the California Subclass members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiffs and the California Subclass members.

184. Plaintiffs and the California Subclass members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing their Sensitive Information.

185. By causing third-party cookies and Tracking Tools to be placed on users' browsers and devices and by transmitting users' Sensitive Information to third parties despite users' opt-outs, and without users' opt-ins, Defendant violated Plaintiffs' and the California Subclass members' reasonable expectation of privacy.

186. Defendant's intrusion, placing third-party Tracking Tools and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

187. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiffs and the California Subclass members have been harmed and are entitled to compensatory, punitive, and injunctive relief.

CLASS ACTION COMPLAINT - 54

**COUNT IV**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiffs and the California Subclass)**

188.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

189.    CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

190.    The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

191.    Within the relevant time period, the Tracking Entities procured by the Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and the California Subclass members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California. The information collected by the Tracking Tools

CLASS ACTION COMPLAINT - 55

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate Cal. Penal Code § 631.

192.    Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

193.    Plaintiffs and the California Subclass members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

**COUNT V**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 638.51**
**(On Behalf of Plaintiffs and the California Subclass)**

194.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

195.    California's Pen Register and Trap and Trace Law is part of CIPA, codified at Cal. Penal Code § 638.51.

196.    A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

197.    A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

198.    "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

CLASS ACTION COMPLAINT - 56

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

199.    California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" Cal. Penal Code § 638.51(a).

200.    Defendant is "a provider of electronic or wire communication service" as they provide the Website, where users send electronic communications. Cal. Penal Code § 638.51(b).

201.    No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant. Defendant uses pen register and trap and trace processes on its Website by deploying Tracking Tools designed to capture phone numbers, email addresses, routing information, addresses, and other signaling information of website users. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

202.    Defendant was not authorized by any court order to use pen register or trap and trace devices to track Plaintiffs', and the California Subclass members' activity on the Website.

203.    Defendant did not obtain consent from Plaintiffs or the California Subclass members before using pen register or trap and trace technology to identify users of its Website, and has therefore violated Cal. Penal Code § 638.51.

204.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 638.51.

## COUNT VI
### Violation of the California Consumer Legal Remedies Act
### Cal. Civ. Code §§ 1770, et seq.
### (On behalf of Plaintiffs and the California Subclass)

205.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

206.    The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or

CLASS ACTION COMPLAINT - 57

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

lease of goods or services to any consumer."

207. Defendant is a person within the meaning of the CLRA.

208. Plaintiffs are consumers of Defendant's services under the CLRA, as Plaintiffs used Defendant's Website to browse and/or purchase products.

209. Defendant undertook deceptive acts or practices in violation of the CLRA by failing to disclose the use of cookies to track users on the Website despite the privacy elections of users. Defendant violated Cal. Civ. Code § 1770(a) of the CLRA by "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services."

210. By this failure to disclose, Defendant violated Cal. Civ. Code § 1770(a)(5) of the CLRA by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

211. By this failure to disclose, Defendant violated Cal. Civ. Code § 1770(a)(14) of the CLRA by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

212. Defendant's failure to disclose was material to Website users such as Plaintiffs. Users could have chosen a different website that did not use Tracking Tools. Users could have chosen a website that disclosed the presence of Tracking Tools and allowed them to be disabled. Users could have chosen a website that requested consent before implementing Tracking Tools.

213. Defendant undertook deceptive acts or practices in violation of the CLRA by fraudulently misrepresenting the presence of the Tracking Tools on the Website.

214. By this fraud, Defendant violated Cal. Civ. Code § 1770(a)(5) by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

215. By this fraud, Defendant violated Cal. Civ. Code § 1770(a)(14) of the CLRA by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

CLASS ACTION COMPLAINT - 58

### COUNT VII
**Violation of the California Unfair Competition Law
Cal. Bus. & Prof. Code § 17200, et seq. ("UCL")
(On Behalf of Plaintiffs and the California Subclass)**

216. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

217. The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

218. By actively and affirmatively misleading consumers by omitting to inform them of the Tracking Tools on the Website in violation of, *inter alia*, the federal Wiretap Act, the California Constitution, and the CLRA, Defendant has violated the unlawful prong of the UCL.

219. By actively and purposefully installing a wiretap without a user's consent in violation of the federal Wiretap Act and CIPA, Defendant has violated the unlawful prong of the UCL.

220. By actively and purposefully installing a pen register and trap and trace device without user consent in violation of the federal Wiretap Act and CIPA, Defendant has violated the unlawful prong of the UCL.

221. By actively and fraudulently deceiving users about their ability to disable the tracking pixels, Defendant has violated the fraudulent prong of the UCL.

222. Defendant failed to disclose or otherwise misled users as to the use of the Tracking Tools on the Website after users attempted to opt out of those Tracking Tools. Defendant disclosed users' personal identifying information without knowledge or consent. Defendant disclosed users' information to Tracking Entities to build personal profiles without knowledge or consent. Defendant failed to disclose that it was wiretapping users' communications with the Website. Defendant fraudulently deceived users about its ability to disable the tracking pixels. Through this conduct, Defendant violated the unfair prong of the UCL.

CLASS ACTION COMPLAINT - 59

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

223.    Plaintiffs have standing to bring claims against Defendant under the UCL. Plaintiffs' information was tracked and recorded without consent. Plaintiffs' data was used to build personal profiles for advertising purposes without consent.

224.    Plaintiffs would have considered it important to the decision to visit Defendant's Website to know that their data was being tracked and recorded without their consent, and regardless of privacy elections made through the Cookie Banner and Cookie Settings.

225.    Instead, Plaintiffs exercised the Website's privacy controls and continued using the Website in reliance on Defendant's misrepresentations that non-essential Tracking Tools had been disabled and that Plaintiffs 's Sensitive Information would not be sold to or shared with third parties.

226.    Because of Defendant's UCL violations described above, Plaintiffs suffered injury by losing control of their personal data, diminution in the value of their personal data, and having their personal information tracked and recorded without their consent.

### COUNT VIII
### COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
### (On Behalf of Plaintiffs and the Class)

227.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

228.    Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

229.    Defendant made affirmative representations to Plaintiffs and the Class Members through its Cookie Banner, Cookie Settings, and related disclosures that users could opt out of, or needed to opt in to, the use of the Tracking Tools and could decline all non-necessary cookies.

230.    Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, including targeting and performance cookies, and would stop the sale or sharing of users' Sensitive Information with the Tracking Entities via cookies.

CLASS ACTION COMPLAINT - 60

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

231. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

232. These representations were false and misleading. Before users, including Plaintiffs and the putative Class members, were able to exercise the purported opt-in choice provided by Defendant, or otherwise reject all Tracking Tools or decline all non-necessary cookies, Defendant deployed the Tracking Tools to intercept and collect Plaintiffs' and the Class members' user data and transmit the same to the Tracking Entities, despite Defendant's representation in the Cookie Banner and Cookie Settings that it would not track users until they consented to the Tracking Tools.

233. Defendant knew its representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

234. Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

235. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

236. Plaintiffs and the Class members reasonably and justifiably relied on Defendant's misrepresentations by exercising the opt-out controls and continuing to use the Website. Had Plaintiffs known that Defendant's representations were false, they would not have used the Website.

CLASS ACTION COMPLAINT - 61

237.    Plaintiffs' reliance was reasonable because Defendant presented the Cookie Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

238.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Class members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiffs suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, diminution in the value of their personal data, and loss of the privacy protection Defendant represented it would provide.

239.    Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out and would not occur unless users opted in.

## COUNT IX
### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

240.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth and realleged herein.

241.    Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

242.    Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

243.    It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

244.    Plaintiffs and the Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Class Members. Equity

CLASS ACTION COMPLAINT - 62

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Class Members are entitled to the relief set forth below.

## **PRAYER**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a.  An order certifying the class and making all appropriate class management orders;

b.  For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the respective Class and Subclass and their counsel as Class Counsel;

c.  For an order declaring the Defendant's conduct violates the statutes referenced herein;

d.  For an order finding in favor of Plaintiffs, the Class, and the California Subclass on all counts asserted herein;

e.  Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

f.  An award of statutory damages or penalties to the extent available;

g.  For damages in amounts to be determined by the Court and/or jury;

h.  For pre-judgment interest on all amounts awarded;

i.  For an order of restitution and all other forms of monetary relief;

j.  An award of all reasonable attorneys' fees and costs; and

k.  Such other and further relief as the Court deems necessary and appropriate.

CLASS ACTION COMPLAINT - 63

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 8, 2026

**TOUSLEY BRAIN STEPHENS PLLC**

By: /s/ *Kim D. Stephens, P.S.*
By: /s/ *Rebecca L. Solomon*
Kim D. Stephens, P.S., WSBA #11984
kstephens@tousley.com
Rebecca L. Solomon, WSBA #51520
rsolomon@tousley.com
1200 Fifth Avenue, Suite 1700
Seattle, Washington, 98101
Telephone: 206.682.5600/Fax: 206.682.2992

Mark S. Reich*
mreich@zlk.com
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: 212.363.7500/Fax: 212.363.7171

**Pro hac vice* application forthcoming

*Attorneys for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT - 64

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992